1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10   MICHAEL BAGSHAW,                )      NO. EDCV 09-1365-CT
                                     )
11            Plaintiff,             )      OPINION AND ORDER
                                     )
12        v.                         )
                                     )
13   MICHAEL J. ASTRUE,              )
     Commissioner of                 )
14   Social Security,                )
                                     )
15                                   )
              Defendant.             )
16                                   )
     _____)

17

18        For the reasons set forth below, it is ordered that judgment be

19   entered in favor of defendant Commissioner of Social Security ("the

20   Commissioner") because the Commissioner's decision is supported by

21   substantial evidence and is free from material legal error.

22                            SUMMARY OF PROCEEDINGS

23        On July 30, 2009, plaintiff, Michael Bagshaw ("plaintiff"), filed

24   a complaint seeking judicial review of the denial of benefits by the

25   Commissioner pursuant to the Social Security Act ("the Act").   On

26   November 5, 2009, plaintiff filed a brief with points and authorities in

27   support of remand or reversal.   On January 6, 2010, the Commissioner

28   filed a brief in opposition.

## SUMMARY OF ADMINISTRATIVE RECORD

1. **Proceedings**

On May 10, 2006, plaintiff filed an application for Supplemental Security Income ("SSI"), alleging disability since April 1, 2001, due to mental impairment, weakness in the left arm and elbow, and pain and weakness in right leg. He also alleged manic depression, anxiety, and bipolar disorder. (TR 155.)[1] The application was denied initially and upon reconsideration. (TR 67-76, 79-84.)

On February 16, 2007, plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (TR 86.) On February 12, March 28, and September 26, 2008, plaintiff appeared and testified before an ALJ. (TR 23-25, 30-48, 61.) The ALJ also considered vocational expert ("VE") testimony at the March 28 and September 26, 2008 hearings (TR 48-52, 59-61.)

On December 2, 2008, the ALJ issued a decision that plaintiff was not disabled, as defined by the Act, because he remains able to do a limited range of light level work, and that he thus was not eligible for benefits.[2] (TR 8-21.) On December 18, 2008, plaintiff filed a request with the Social Security Appeals Council to review the ALJ's decision. (TR 4.) On June 8, 2009, the request was denied. (TR 1-3.)

---

[1]    "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

[2]    Furthermore, plaintiff was incarcerated for approximately eight months beginning in 2006 and six months beginning in 2007. (TR 12.)   The Act does not provide SSI benefits to an otherwise eligible person "with respect to any month if throughout such month he is an inmate of a public institution." See 42 U.S.C. § 1382(e)(1)(A).

1 | Accordingly, the ALJ's decision stands as the final decision of the
2 | Commissioner.  Plaintiff subsequently sought judicial review in this
3 | court.

4 | 2.   Summary Of The Evidence

5 | The ALJ's decision is attached as an exhibit to this opinion and
6 | order and materially summarizes the evidence in the case.

7 | PLAINTIFF'S CONTENTIONS

8 | Plaintiff contends the ALJ erred in failing to properly consider:
9 | 1.   The treating psychiatrist's opinion;
10 | 2.   The lay witness' statements;
11 | 3.   The plaintiff's residual functional capacity; and,
12 | 4.   Whether plaintiff is capable of performing the jobs of mail clerk,
13 | bench assembler, and electronics worker.

14 | STANDARD OF REVIEW

15 | Under 42 U.S.C. §405(g), this court reviews the Commissioner's
16 | decision to determine if: (1) the Commissioner's findings are supported
17 | by substantial evidence; and, (2) the Commissioner used proper legal
18 | standards.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).
19 | Substantial evidence means "more than a mere scintilla," Richardson v.
20 | Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.
21 | Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

22 | When the evidence can reasonably support either affirming or
23 | reversing the Commissioner's conclusion, however, the Court may not
24 | substitute its judgment for that of the Commissioner.  Flaten v. Sec'y
25 | of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995).

26 | The court has the authority to affirm, modify, or reverse the
27 | Commissioner's decision "with or without remanding the cause for

1  rehearing."   42 U.S.C. §405(g).

2                              DISCUSSION

3      1.   The Sequential Evaluation

4      A person is "disabled" for the purpose of receiving social security

5  benefits if he or she is unable to "engage in any substantial gainful

6  activity by reason of any medically determinable physical or mental

7  impairment which can be expected to result in death or which has lasted

8  or can be expected to last for a continuous period of not less than 12

9  months."   42 U.S.C. §423(d)(1)(A).

10     The Commissioner has established a five-step sequential evaluation

11 for determining whether a person is disabled.   First, it is determined

12 whether the person is engaged in "substantial gainful activity."   If so,

13 benefits are denied.

14     Second, if the person is not so engaged, it is determined whether

15 the person has a medically severe impairment or combination of

16 impairments.   If the person does not have a severe impairment or

17 combination of impairments, benefits are denied.

18     Third, if the person has a severe impairment, it is determined

19 whether the impairment meets or equals one of a number of "listed

20 impairments." If the impairment meets or equals a "listed impairment,"

21 the person is conclusively presumed to be disabled.

22     Fourth, if the impairment does not meet or equal a "listed

23 impairment," it is determined whether the impairment prevents the person

24 from performing past relevant work.   If the person can perform past

25 relevant work, benefits are denied.

26     Fifth, if the person cannot perform past relevant work, the burden

27 shifts to the Commissioner to show that the person is able to perform

28                                4

1  other kinds of work.   The person is entitled to benefits only if the

2  person is unable to perform other work.   20 C.F.R. § 416.920; Bowen v.

3  Yuckert, 482 U.S. 137, 140-42 (1987).

4     2.   Issues

5       A.   Treating Psychiatrist's Opinion (Issue #1)

6     Plaintiff first contends the ALJ failed to give proper weight to

7  the opinion of plaintiff's treating psychiatrist, Ahmad K. Tarar, M.D.,

8  because "there is no indication the ALJ addressed Dr. Tarar's two

9  consistent rated [Global Assessment of Functioning ("GAF")] scores of

10  50."[3]

11     This contention is belied by the record.   The ALJ specifically

12  addressed the GAF scores assessed by: Dr. Tarar, plaintiff's veteran's

13  administration ("VA") psychologist, a prison psychiatrist, the

14  consultative examining psychiatrist, and a VA nurse practitioner-ranging

15  from Dr. Tarar's assessed GAF score of 50 to the consultative examiner's

16  and prison psychiatrist's of 65[4]-and concluded that none of these was

17  _____

18     [3]   The GAF score is a "rough estimate" of an individual's
psychological, social, and occupational functioning that is used
19  to reflect the individual's need for treatment.   (See American
Psychiatric Association, American Psychiatric Association,
20  Diagnostic and Statistical Manual of Mental Disorders (4th ed.
21  2000 (DSM-IV)).

22     [4]   A GAF score of 41-50 indicates: "serious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent
23  shoplifting) OR any serious impairment in social, occupational,
or school functioning (e.g., no friends, unable to keep a job)."
24     A GAF score of 51-60 indicates: "[m]oderate symptoms (e.g.,
flat affect and circumstantial speech, occasional panic attacks)
25  OR moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or
26  co-workers).
   A GAF score of 61-70 indicates: "[s]ome mild symptoms (e.g.,
27  depressed mood and mild insomnia) OR some difficulty in social,

28

1  entitled to significant weight on the basis that, while they may suggest

2  varying degrees of mental impairment, the GAF score itself does not

3  establish or correlate with *work-related* limitations. (TR 17, 307, 314,

4  397, 434.) This conclusion is not materially in error. Indeed, the

5  Commissioner has determined the GAF scale "does not have a direct

6  correlation to the severity requirements in [the Social Security

7  Administration's] mental disorders listings." 65 Fed.Reg. 50,746, 50,765

8  (Aug. 21, 2000); see also Vasquez v. Astrue, 572 F.3d 586, 596-97 (9th

9  Cir. 2009) (remanding for further assessment of mental functional

10 limitations in part because GAF score did not automatically translate

11 into functional limitations).

12     Furthermore, the evidence substantially supports the ALJ's

13 assessment of plaintiff's mental functioning.   In evaluating the

14 severity of plaintiff's alleged mental impairments and the impact on

15 these of plaintiff's history of methamphetamine abuse, the ALJ set out,

16 in expansive detail, the findings and conclusions contained in the

17 medical record in that regard, and concluded plaintiff has the following

18 mental functional limitations:

19      [Plaintiff's] mental impairment causes moderate limitations in his
        ability to do the following: understand, remember, and carry out
20      detailed instructions; complete a normal work day and work week
        without interruptions from psychologically based symptoms; perform
21      at a consistent pace without an unreasonable number and length of
        rest periods; and interact appropriately with the general public.
22      The [plaintiff] is limited to simple repetitive tasks with
        occasional public contact.
23

24 (TR 11.) These limitations are *narrower* than those opined by both the

25 ————————————————

26 occupational, or school functioning..., but generally functioning
   pretty well, has some meaningful interpersonal relationships."
27 American Psychiatric Association, Diagnostic and Statistical
   Manual of Mental Disorders p. 32 (4th ed. 1994 (DSM-IV)).

28                                    6

consultative examining psychiatrist and the psychiatric medical expert, (see TR 314, 511), and effectively mirror the limitations opined by the state agency reviewing psychiatrists, (see TR 341-42, 413). The VA psychiatrist and psychologist did not provide a functional assessment or recommend plaintiff refrain from working due to any mental impairment. (See, e.g., 434-35, 440.)

When, as here, the medical evidence is in conflict, it is solely the province of the ALJ to weigh the conclusions and findings and to resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). If the findings of state agency reviewing physicians are supported by an consistent with other evidence in the record, they may serve as substantial evidence in support of a finding of non-disability. Id. Because the state agency findings here are supported by substantial record evidence, the court may not interpose its judgment for that of the ALJ in finding that these reports were entitled to controlling weight with respect to plaintiff's mental functional limitations. See Morgan v. Commissioner, 169 F.3d 595, 599 (9th Cir.1999) (if evidence exists to support more than one rational interpretation, the court must defer to the Commissioner's decision).

In any event, there is abundant evidence of alcohol and methamphetamine use, and plaintiff's lack of credibility in that regard and, notably, plaintiff does not challenge the credibility finding. (See, e.g., TR 12-18.) Plaintiff is not considered to be disabled if alcoholism or drug addiction is a "contributing factor" material to the Commissioner's determination that plaintiff is disabled. See 42 U.S.C. § 423 (d) (2) (C).

There is no material legal error here.

7

B.   <u>Lay Witness Testimony</u> (Issue #2)

Plaintiff next contends the ALJ failed to apply legally sufficient standards in evaluating the third-party function report submitted by plaintiff's mother.

As plaintiff correctly points out, "descriptions by friends and family members in a position to observe [plaintiff's] symptoms and daily activities have routinely been treated as competent evidence." <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1232 (9th Cir. 1987).   Accordingly, lay testimony "as to a [plaintiff's] symptoms or how an impairment affects ability to work . . . cannot be disregarded without comment." <u>Stout v. Comm'r of Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006)(citations omitted).   Rather, "[i]f the ALJ wishes to discount the testimony of the lay witness, he must give reasons that are germane to [that] witness for doing so." <u>Id.</u> (citations omitted).

The mere fact that a witness is a family member, alone, does not constitute a germane ground to reject the lay witness's testimony wholesale. <u>See</u> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289 (9th Cir. 1996). An ALJ may, however, reject a lay witnesses statements if the ALJ finds the facts suggest the witness may be biased. <u>E.g.</u>, <u>Greger v. Barnhart</u>, 464 F.3d 968, 972-73 (9th Cir. 2006) (the fact that girlfriend's "close relationship" with plaintiff "possibly" influenced her desire to help him was a germane reason to disregard her testimony); <u>Crane v. Shalala</u>, 76 F.3d 251, 254 (9th Cir. 1996) (the ALJ did not err in concluding that a physician who helped plaintiff apply for benefits was not able to be objective).   Other reasons "germane" to a particular witness may include that the witness's testimony is contradicted by the medical evidence of record, <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005), or that

1   the witness has made contradictory or inconsistent statements, e.g.,

2   Lewis v. Apfel, 236 F.3d 503, 512 (9th cir. 2001).

3       It is the province of the ALJ, and not this court, to weigh

4   credibility, and when the evidence is susceptible of more than one

5   rational interpretation, it is the Commissioner's conclusion which must

6   be upheld.  Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985).

7       Here, the ALJ found the statement of plaintiff's mother was largely

8   credible and that "[m]ost of [her] answers support the residual

9   functional capacity ['RFC'] found herein."    (TR 17, 176-83.)  He

10  concluded, however, that her statement was not credible to the extent it

11  suggested limitations in excess of those set out in the RFC because:

12  •    her statement was not made under oath (TR 176-83);

13  •    the statement essentially parrots the subjective complaints of

14       plaintiff and was completed on the same day as plaintiff's was

15       (compare TR 176-83 with 165-72);

16  •    plaintiff lives with his mother and has only a small monthly income

17       from the VA, which suggests she has a financial motive in seeing

18       him receive benefits;

19  •    her statements are not supported by the clinical or diagnostic

20       medical evidence that is discussed extensively throughout the

21       decision (see TR 15-18).

22  (TR 17-18.)  The court has reviewed the entire administrative record and

23  concludes that these findings are supported by substantial evidence and,

24  moreover, provide germane and legally sufficient reasons for the ALJ not

25  to credit the statement in its entirety.  Even assuming plaintiff is

26  correct, which this court does not, that the ALJ should give the same

27  weight to an unsworn statement of a source found to be biased as he

28

9

would to sworn testimony, the credibility evaluation is substantially supported, as a whole. See <u>Carmickle v. Comm'r of Social Sec. Admin.</u>, 533 F.3d 1155 (9th Cir. 2008) (where the ALJ's made findings that supported the adverse credibility finding and the ALJ's errors did not negate the validity of the ALJ's otherwise supported credibility determination, the errors were harmless).

There is no material legal error here.

C.   <u>Residual Functional Capacity</u> (Issue # 3)

Plaintiff next contends the ALJ's RFC assessment is not supported by substantial evidence because it does not include limitations, opined by the state agency reviewing physicians, to the effect that plaintiff must avoid "concentrated exposure" to machinery and heights. (TR 28, 347.)

Although plaintiff is correct that the ALJ omitted these limitations from the RFC finding, (<u>see</u> TR 11), within the body of the decision he specifically adopted these limitations, and, more importantly, he included them in the hypothetical proposed to the VE, (<u>see</u> TR 18, 49-50.)

This is legally sufficient. <u>See</u>, <u>e.g.</u>, <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (any error in finding plaintiff's bursitis to be non-severe was harmless where ALJ considered the limitations caused by the bursitis at Step 4 of the sequential evaluation).

There is no material legal error here.

D.   <u>VE hypothetical</u> (Issue # 4)

Last, plaintiff contends the decision is in error because the three

light-exertion level jobs proposed by the VE[5] are inappropriate for plaintiff, given the found limitations (1) permitting him to perform only simple, routine tasks; and (2) precluding him from "concentrated" exposure to hazards.

The VE testified that plaintiff could perform the light work occupations of mail clerk (DICOT 209.687-026, 1991 WL 671813 (G.P.O.)),[6] bench assembler (DICOT 726.364-018, 1991 WL 679581 (G.P.O.)),[7] and electronics worker (DICOT 726.687-010, 1991 WL 679633 (G.P.O.)).[8]

1.   Simple, routine tasks

Plaintiff suggests the reasoning component of the General Education Development ("GED") requirements for two of the jobs proposed for him, as defined in U.S. Department of Labor's Dictionary of Occupational Titles, ("DICOT"), (4th ed. 1991), exceed his intellectual capacity.

The DICOT's GED guidelines are subdivided into three categories—reasoning development, mathematical development, and language development—rated on a scale from 1 (lowest) to 6 (highest).   (DICOT,

---

[5]   The VE also opined significant numbers of jobs that fall within the sedentary exertion level are appropriate for someone with plaintiff's RFC, which testimony is not at issue here. (TR 51-52.) In any event, as discussed in the body of this order, the court concludes substantial evidence established significant numbers of jobs exist at the light exertion level for someone with plaintiff's RFC.

[6]   The VE testified this type of job is available for someone with plaintiff's limitations to the effect of 3,500 jobs locally and 47,000 nationally.   (TR 50.)

[7]   The VE testified this type of job is available for someone with plaintiff's limitations to the effect of 45,000 jobs locally and 400,000 nationally.   (TR 50-51.)

[8]   The VE testified this type of job is available for someone with plaintiff's limitations to the effect of 2,500 jobs locally and 10,000 nationally.   (TR 51.)

1    Appendix C, 1991 WL 688702.)

2      The first job proposed for plaintiff, mail clerk, requires a

3 reasoning level of 3. This requires an employee to "[a]pply commonsense

4 understanding to carry out instructions furnished in written, oral or

5 diagrammatic form" and to "[d]eal with problems involving several

6 concrete variables in or from standardized situations." (See DICOT

7 209.687-026, 1991 WL 671813 (G.P.O.)) Plaintiff is correct that the

8 reasoning level 3 and, consequently, the mail clerk job, are

9 inconsistent with his intellectual functional capacity limitation to

10 simple, routine work. See, e.g., Hackett v. Barnhart, 395 F.3d 1168,

11 1176 (10th Cir. 2005) (finding that a limitation to simple and routine

12 work tasks "seems inconsistent with the demands of level-three

13 reasoning"); Estrada v. Barnhart, 417 F.Supp. 2d 1299, 1303-04 (M.D.

14 Fla. 2006) (finding that jobs requiring reasoning level of 3 exceeded

15 plaintiff's limitation to simple interactions and tasks).

16      However, the remaining two positions proposed for plaintiff, bench

17 assembler and electronics worker, carry a reasoning development level of

18 2. (See DICOT 726.364-018, 1991 WL 679581 (G.P.O.)); 726.687-010, 1991

19 WL 679633 (G.P.O.)). This would require plaintiff to "[a]pply

20 commonsense understanding to carry out detailed but uninvolved written

21 or oral instructions. Deal with problems involving a few concrete

22 variables in or from standardized situations." Id.

23      Based on the ALJ's findings with respect to plaintiff's mental RFC,

24 plaintiff retains the mental capacity to do these jobs. See, e.g.,

25 Hackett, 395 F.3d at 1176 (finding level 2 reasoning consistent with an

26 ability to perform "simple and repetitive" tasks); Meissl v. Barnhart,

27 403 F.Supp.2d 981, 984-85 (C.D. Cal. 2005) (holding plaintiff who could

28

1  perform "simple tasks . . . at a routine pace" could perform jobs with
2  reasoning level of 2); Flaherty v. Halter, 182 F.Supp.2d 824, 850-51 (D.
3  Minn. 2001) (finding that ALJ's found limitation to "simple, routine,
4  repetitive, concrete, tangible tasks" did not conflict with DICOT level
5  2 reasoning).

6      Therefore, even if plaintiff is unable to perform the mail clerk
7  position, there remain significant numbers of jobs plaintiff can perform
8  in the regional and national economy. See Meanel v. Apfel, 172 F.3d
9  1111, 1115 (9th Cir.1999)(between 1,000 and 1,500 jobs in the regional
10  economy constitutes a significant number for purposes of the meaning of
11  the Social Security Act); Barker v. Secretary of Health and Human
12  Services, 882 F.2d 1474, 1479 (9th Cir.1989) (1,266 jobs in regional
13  economy constitutes significant numbers).

14      There is no material legal error here.

15          2.   Hazards

16      As was explained above, the VE testified the jobs proposed for
17  plaintiff were appropriate for someone precluded, as is plaintiff, from
18  "concentrated" exposure to "hazards," such as machinery and heights. (TR
19  49-51.)  Plaintiff contends, however, that the two jobs appropriate for
20  someone with his mental RFC, bench assembler and electronics worker,
21  exceed this limitation because they require among their range of duties
22  some level of exposure to hand tools and power tools.

23      The court is unpersuaded that a limitation to avoid "concentrated
24  exposure" to hazards–as opposed to a limitation precluding "moderate" or
25  even "all" exposure to hazards (see TR 346)–prohibits plaintiff from the
26  occasional use of hand or power tools contemplated by the DICOT
27  definitions, particularly that the job descriptions further indicate
28                                    13

1  that a worker in these fields will not be exposed to "moving mechanical

2  parts." (See DICOT 726.364-018, 1991 WL 679581 (G.P.O.)); 726.687-010,

3  1991 WL 679633 (G.P.O.))

4      There is no material legal error here.

5  CONCLUSION

6      If the evidence can reasonably support either affirming or

7  reversing the Commissioner's conclusion, the court may not substitute

8  its judgment for that of the Commissioner.  Flaten v. Sec'y of Health

9  and Human Servs., 44 F.3d at 1457.

10      After careful consideration of the record as a whole, the

11  magistrate judge concludes that the Commissioner's decision is supported

12  by substantial evidence and is free from material legal error.

13  Accordingly, it is ordered that judgment be entered in favor of the

14  Commissioner.

15  DATED: 1/20/10

16  

17  CAROLYN TURCHIN
    UNITED STATES MAGISTRATE JUDGE

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28

**SOCIAL SECURITY ADMINISTRATION**
Office of Disability Adjudication and Review

DECISION

| IN THE CASE OF | CLAIM FOR |
|---|---|

Michael David Bagshaw

Supplemental Security Income

(Claimant)

████████████

(Social Security Number)

(Wage Earner)

## JURISDICTION AND PROCEDURAL HISTORY

On May 10, 2006, the claimant filed an application for supplemental security income, alleging disability beginning April 1, 2001. The claim was denied initially on June 15, 2006, and upon reconsideration on February 8, 2007. Thereafter, the claimant filed a written request for hearing on February 16, 2007 (20 CFR 416.1429 *et seq.*). The claimant appeared and testified at hearings held on March 28, 2008 and September 26, 2008, in Palm Springs, CA. Corinne J. Porter, an impartial vocational expert, also appeared at the hearing. The claimant is represented by Daniel Keenan, an attorney.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912(d).

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since May 10, 2006, the date the application was filed.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

8

See Next Page



Michael David Bagshaw (                    Page 2 of 13

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

**9**

Michael David Bagshaw (█████████)                              Page 3 of 13

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912(g) and 416.960(c)).

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.    The claimant has not engaged in substantial gainful activity since May 10, 2006, the application date (20 CFR 416.971 *et seq.*).**

**2.    The claimant has the following severe impairments: disorders of muscle, ligament, and fascia; depressive disorder, not otherwise specified (NOS); and a history of methamphetamine dependence (20 CFR 416.921 *et seq.*).**

The claimant's impairments affect him more than minimally; thus, they are considered to be severe.

**3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).**

The claimant's back, left arm, and right knee disorders do not meet or equal 1.04 (major dysfunction of a joint) or 1.03 (reconstructive surgery of a joint).

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

**10**

See Next Page

Michael David Bagshaw (█████████████)                Page 4 of 13

In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has mild difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

4.   **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a narrow range of light exertion. The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. He can push and weight 20 pounds occasionally and 10 pounds frequently with the lower extremities. He can stand and walk for 6 hours out of an 8-hour work day, and he can sit for 6 hours out of an 8-hour work day. He can occasionally climb, bend, stoop, kneel, crawl, and squat. He can perform frequent gross handling with the left upper extremity. He has no restrictions using the right upper extremity. The claimant's mental impairment causes moderate limitations in his ability to do the following: understand, remember, and carry out detailed instructions; complete a normal work day and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. The claimant is limited to simple repetitive tasks with occasional public contact.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable

**11**

clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

At the March 28, 2008 hearing, the claimant testified he is 5'8" and currently weighs 178 pounds. His generally weighs less. He has had 13 years of education. He is not currently working, and he receives a VA pension. He last worked in 2005 as a self-employed landscaper. He also installed water systems. He had pain in his back, and he could not bend. The claimant has lived with his mother since May 2006. He has limited movement in his back and legs, and sharp pains in his right knee. He has had back pain since an accident in 2004. His back pain has worsened since he has applied for SSI. He has to lie down a lot and can only sit and stand for short periods. He has pain on a daily basis. The pain is primarily in his right leg. He has had a steel rod extending from his knee to his hip that has been in place since 1980 or 1981. He was in prison for 8 months, from 2006 to 2007 on a conviction of possession for sales of drugs. He will be on parole until November 2009. He last used drugs three years ago, and he has been clean since that time. He has pain 90% of the time between his knee and hip. The pain is worse in the hip and back area. The left leg pain is in the knee cap. He always wears a knee brace because it helps support his knee. He used it even when he was working. He takes Ibuprophen, which is prescribed at the VA Hospital. He takes sleeping medication at night because of the pain. He is tired during the day time and spends about 3 hours lying down. He goes to bed between 10:00 p.m. and 11:00 p.m. He can sit for 10-15 minutes at a time and stand for the same amount of time. Even with a sit/stand/walk option, the claimant does not believe he can work. He limps when he walks and would have too much pain in his hip. At the most, he can lift 10-15 pounds, and he can only push and pull the same amount of weight. The pain is alleviated if he takes more pain medication than what is prescribed. He occasionally has knee pain. He has not had physical therapy and was not offered therapy. He last drank alcohol one year ago. The claimant spends most of his time at home. He does household chores such as vacuuming, laundry, washing dishes, and cooking. He and his mother shop and go around town on short errands. The claimant tries to walk around the mobile home park, which contains about 160 units. He stopped playing darts 2-3 years ago. He swims at least once a week 10 laps, and he watches his mother bowl once a week. The claimant also goes to the movies.

At the hearing on September 26, 2008, the claimant testified he cannot work for 8 hours. He was initially released from prison in May 2006. He then returned to prison from April 2007 to October 2007 on a parole violation.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of

**12**

Michael David Bagshaw (█████████)                           Page 6 of 13

these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Records from the Veteran's Administration show that on December 9, 2002, pelvis x-rays showed an intramedullary rod traversing the right femur and an old ununited fracture defect of the greater trochanter, but no recent fracture and no degenerative changes (Exhibit 1F, p. 5). X-rays of the left elbow showed an ununited fracture status post internal fixation (Exhibit 1F, p. 3). On April 25, 2005, the claimant was initially seen for complaints of back pain and fatigue (Exhibit 1F, p. 28). The claimant also tested positive for hepatitis C (Exhibit 1F, p. 10), but the record shows no treatment or complaints for this condition, which is considered non-severe.

Records from the California Department of Corrections date from October 25, 2005 to April 26, 2006 (Exhibit 3F). When initially incarcerated, the claimant reported limitations to his right knee and left arm due to fractures that were surgically repaired, and which rendered him 30% disabled by the Navy in 1982 (Exhibit 3F, p. 33). The claimant took Ultram for pain, otherwise, he was not treated for this impairment. He received treatment only for basal cell carcinoma and depressive complaints. Just prior to discharge, the claimant said he was anxious about his release and concerned about whether or not he would be able to obtain his license so that he could resume truck driving (Exhibit 3F, p. 3).

After being released from prison, the claimant returned to the Veteran's Administration for treatment of back and knee pain. The claimant's provider referred him to orthopedics, but he was a no-show for two scheduled visits (Exhibit 18F, p. 7). On one occasion in July 2006, the claimant went to one of his doctor's visits in a wheelchair because of knee pain (Exhibit 10F, p. 27), but there is no evidence he requires an assistive device.

On July 7, 2006, Dr. Sean To conducted an orthopedic consultative examination of the claimant, whose chief complaints were headaches due to basal cell carcinoma on his forehead, and joint pain (Exhibit 5F). On examination, the claimant measured 67" in height and weighed 163 pounds (Exhibit 5F, p. 2). His blood pressure reading was 126/82. Grip strength testing was 140/140/140 with the right dominant hand and 100/100/100 with the left hand. The claimant had ulcerated erythematosus lesions on the right temporal area, which was non-healing at the time. Heart and lung sounds were normal, and the liver was not palpable (Exhibit 5F, p. 3). The claimant's muscle tone and mass were normal. The claimant had tenderness to the left elbow with decreased range of motion with extension. The claimant had tenderness over the right femur and right knee with moderate crepitus, but no effusion, and no limitations on range of motion. Range of motion of all other extremities as well as the back and neck were normal without spasm. Motor strength, sensation, and reflexes were normal, and the claimant had a normal gait (Exhibit 5F, p. 4). Dr. To concluded that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk without restrictions; no more than frequent walking on uneven terrain, climbing ladders, or working at heights; no more than frequent gross manipulations; and avoid working with heavy machinery (Exhibit 5F, p. 5). X-rays of the left elbow showed an old comminuted fracture of the left ulnar that was internally fixed (Exhibit 5F, p. 7). Dr. To's opinion is generally consistent with the physical residual functional capacity found herein.

**13**

A physical examination on February 1, 2007 revealed an antalgic gait, a nearly full range of motion, and medial joint tenderness (Exhibit 13F, p. 16).  On November 7, 2007, the claimant complained of knee pain for two months and said that his knee swelled if he walked for prolonged distances.  A physical examination revealed a full range of motion of the right knee without crepitus or effusion (Exhibit 16F, pp. 13-4).  A physical examination on June 17, 2008 revealed slightly decreased strength in the lower extremities.  Sensation and reflexes were normal.  Range of motion of the back was grossly normal but painful (Exhibit 18F, p. 10).  The claimant was referred to physical therapy for his back (Exhibit 18F, p. 10).

On August 12, 2008, a physical examination of the back revealed a limited range of motion of the lumbar spine.  However, the claimant was able to heel and toe walk, and straight leg raising was negative.  Back x-rays showed mild to moderate degenerative joint disease in the lumbosacral spine.  The claimant said he had improved 15-20 percent with the prescribed physical therapy (Exhibit 18F, p. 2).

The claimant has complained of occasional chest pain (Exhibit 16F, p. 14; Exhibit 18F, p. 13), but there is no evidence of coronary artery disease.

The claimant has also been treated for basal cell carcinoma, and he has had multiple skin grafts on his forehead (Exhibit 2F; Exhibit 10F, p. 56).  However, this condition is considered non-severe as it has no more than a minimal effect on the claimant's ability to engage in work-related activities.

Regarding the claimant's mental impairments, Dr. David Glassmire answered the interrogatories in the following manner (Exhibit 17F): the claimant has a depressive disorder, NOS; and a history of amphetamine abuse, which is not a contributing factor material to a finding of disability (Exhibit 17F, p. 4).  The various mental status examinations have been within normal limits (Exhibits 13F, p. 10; 10F, pp. 7, 27, 45; 3F, pp. 3, 4, 24; 4F, p. 3), but the claimant does have depressive symptoms that would likely cause moderate social problems.  The claimant's past history of substance abuse indicates likely problems in judgment (Exhibit 17F, p. 1).  The claimant's impairments do not meet or equal Parts B or C of Listings 12.04 or 12.09.  The claimant has mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in concentration, persistence, or pace; and no repeated episodes of decompensation.  Dr. Glassmire opined that although the records indicate a possible personality disorder (Exhibits 13F, p. 10; 10F, p. 20; 4F, p. 5), there is no evidence of a chronic maladaptive personality disorder that began during the claimant's childhood, which is a requirement for such a diagnosis (Exhibit 17F, pp. 5, 7).  Dr. Glassmire concluded that claimant could perform moderately complex tasks consisting of 4-5 step instructions in a non-public work environment with occasional non-intense contact with others.  The claimant should not be responsible for the safety of others (Exhibit 17F, p. 8).  Dr. Glassmire's opinion is generally consistent with the residual functional capacity found herein; however, the undersigned finds that the limitations assessed by the State Agency review psychiatrists are more consistent with the overall evidence.

**14**

See Next Page

Michael David Bagshaw (██████)                                    Page 8 of 13

Records from California Department of Corrections show that the claimant was determined to have a medically determinable mental impairment with a GAF of 65,[1] and which was treated with clinical case management and Prozac (Exhibit 3F, pp. 21, 26, 39). The record shows that the claimant has also received treatment for depression and substance abuse at the VA Medical Center.

On June 21, 2006, Dr. Kent Jordan conducted a psychiatric consultative examination of the claimant, whose chief complaints were anxiety and depression (Exhibit 4F). Dr. Jordan reported that the claimant's legs had significant involuntary movements during the history taking part of the examination, but when the claimant performed emotionally neutral tasks, the movements largely diminished (Exhibit 4F, p. 1). The claimant said he had a significant drug history of using methamphetamine and cocaine, but the last time he used drugs was in October 2004 (Exhibit 4F, p. 3). During the mental status examination, the claimant appeared mildly anxious, but when distracted, his affect normalized. Thought processes were normal. The claimant claimed he was paranoid and had auditory hallucinations. He denied homicidal or suicidal ideation. Cognition, orientation, memory, concentration, ability to make abstractions, fund of knowledge, insight, and judgment were all intact (Exhibit 4F, p. 4). Dr. Jordan diagnosed polysubstance abuse and dependence, in remission; substance-induced psychotic disorder, with paranoia and auditory hallucinations, in partial remission; and assessed a GAF of 65. Dr. Jordan stated that the claimant did not appear credible when explaining why he could not work. He concluded that the claimant could perform all work-related activities without any mental impairment limitations (Exhibit 4F, p. 5). Dr. Jordan based the psychotic disorder on what the claimant told him; there was no evidence the claimant responded to internal stimuli during his examination, and there is no evidence in the other medical evidence that the claimant is paranoid or that he has hallucinations. Therefore, the undersigned does not adopt that diagnosis. The undersigned finds that the assessments by the State Agency review psychiatrists are more persuasive and supported by the overall evidence.

The claimant has continued with treatment for his mental impairments at the VA Medical Center. On June 23, 2006, the claimant complained of depression, poor appetite, poor sleep, decreased energy, feelings of worthlessness, and decreased concentration (Exhibit 10F, p. 53). The claimant said he had not used methamphetamine for two years, but he continued to drink 2-3 beers a week. The claimant was diagnosed with a mood disorder, not otherwise specified (NOS), amphetamine dependence in sustained full remission, alcohol dependence in sustained partial remission, and assessed a GAF of 60[2] (Exhibit 10F, p. 47). On July 12, 2006, the claimant reported a remote history of heavy drinking with convictions for driving while intoxicated, most recently in 2003. He denied current heavy drinking (Exhibit 10F, p. 44). On February 1, 2007,

---

[1] According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (4th ed., 1994), a GAF score of 61-70 indicates some mild symptoms, such as depressed mood and mild insomnia, or some difficulty in social occupational, or school function, such as occasional truancy or theft within the household, but generally functioning pretty well, and has some meaningful interpersonal relationships.

[2] Per the DSM-IV, a GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

**15**

See Next Page

the claimant said his depression was better with medications, and he was not using the sleeping pills very often at night.   A mental status examination was within normal limits, and a staff psychiatrist assessed a GAF of 50[3].   In October 2007, following his release from prison on the parole violation, the claimant sought treatment for methamphetamine addiction, depression, and anxiety.   The claimant denied alcohol abuse but said he had been treated twice for drug abuse (Exhibit 16F, pp. 2-4).   On October 25, 2007, the claimant said he last used speed/methamphetamine two weeks prior (Exhibit 13F, p. 5).   He also reported losing his last job due to driving under the influence (Exhibit 13F, p. 8).   On October 26, 2007, the claimant said he had relapsed two weeks prior by using ¼ gram of methamphetamine.   He reportedly used 1 gram to a sixtieth of an ounce of methamphetamine on a daily basis from 1984 to 2004. He also reportedly last drank 2 beers the day before and reportedly drank once or twice a week, averaging 2-3 beers (Exhibit 13F, p. 3).   A nurse practitioner diagnosed methamphetamine dependence, nicotine dependence, a history of depression and anxiety disorder, and assessed a GAF of 57 (Exhibit 13F, p. 4).   The claimant was living in a rehabilitation center and been regularly attending group therapy treatment for methamphetamine addiction (Exhibits 14F, 15F).

Apart from objective findings, there are substantial reasons pursuant to Social Security Ruling 96-7p to conclude that the claimant remains able to engage in a wide range of work-related activities.   The claimant is independent in activities of daily living (Exhibit 18F, p. 9), and he exercises at least 3 times each week (Exhibit 18F, p. 15).   During the psychiatric consultative examination, the claimant said he lives with his mother.   Together, they prepare food and do chores.   The claimant also watches television (Exhibit 4F, p. 4).   On June 23, 2006, the claimant said he was bowling every week (Exhibit 10F, p. 53).   He has participated in a nature hike with his therapy group (Exhibit 14F, p. 19).   The claimant testified he last drank one year ago, but the evidence of record contradicts his assertions.   On May 6, 2008, the claimant said he drank 1-2 drinks, 2 to 4 times a month (Exhibit 18F, p. 16).   While the claimant is not a heavy drinker, the record consistently shows the claimant occasionally drinks.   The claimant has not been truthful regarding his methamphetamine abuse.   At the hearing, the claimant testified he last used drugs three years ago, but on October 25, 2007, the claimant said he last used speed/methamphetamine two weeks prior (Exhibit 13F, p. 5), and that was shortly after he had been released from prison on a parole violation.   To his credit, the claimant sought treatment for substance abuse, and there is no evidence of current substance abuse.   During a November 13, 2007 meeting with his addiction therapist, the claimant reported "moderate problems" due to his back impairment and said he was not taking any prescribed medications on a regular basis (Exhibit 12F, p. 13). Shortly before the claimant was being released from prison the first time, he indicated that if he could retrieve a valid commercial driver's license, he would return to his past relevant work as a truck driver (Exhibit 3F, p. 3), which creates an inference that if the claimant's driver's license had been re-instated, he would have returned to his past relevant work and not have applied for disability benefits.   The claimant is not on intensive pain medication, and the medical record shows few objective findings related to his physical impairments.   All of the aforementioned factors are inconsistent with the presence of an incapacitating or debilitating medical condition.

---

[3] Per the DSM-IV, a GAF of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

**16**

The undersigned has considered the GAF scores assessed by various individuals, but these assessments are not entitled to significant weight. Some of these assessments were made by mental health clinicians and social workers who are not considered to be acceptable medical sources. Moreover, although the DSM-IV gives some descriptions that can be followed in defining a GAF score, there is really no evidence to indicate the reliability of cross raters where one can conclude a particular GAF score means a particular limitation in work ability. Although it indicates some limitations in a claimant's functioning, it does not speak directly to the claimant's work capacity.

The undersigned has also considered the 3rd Party Function Report prepared by Martha Wheeler, the claimant's mother (Exhibit 4E). Most of Mrs. Wheeler's answers support the residual functional capacity found herein. Mrs. Wheeler reported that her son's daily activities consist of showering, shaving, dress, assisting with meals, cleaning, doing laundry, shopping, and watching television. Mrs. Wheeler and the claimant do everything together, including going to the movies and eating out (Exhibit 4E, p. 4). The claimant feeds, waters, and plays with their pets. The claimant's medical conditions affect his sleep if he is upset, stressed, or fatigued. The claimant has no problems with personal care (Exhibit 4E, p. 5). Occasionally, Mrs. Wheeler has to remind the claimant to take his medicine. The claimant's house and yard work consist of cooking, doing laundry, cleaning, and some repairs. Depending on the chores, he does them once or twice a week, and only requires normal assistance (Exhibit 4F, p. 6). The claimant goes outside on a daily basis, alone, and he travels by walking. The claimant also drives. He shops weekly for his personal needs, groceries, and occasional items for Mrs. Wheeler. The claimant is not responsible with money (Exhibit 4E, p. 7). Since he seldom has any, he goes "silly with it" (Exhibit 4E, p. 8). The claimant's hobbies include playing darts, swimming, and watching movies. He also visits others. At the time Mrs. Wheeler completed the report, the claimant belonged to a dart league and pool league (Id). The claimant has no problems interacting with others (Exhibit 4E, p. 9). Mrs. Wheeler then reported the claimant's condition affects his ability to do the following: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, and complete tasks. The claimant occasionally requires assistance doing these tasks. He can walk for 1-2 blocks before stopping to rest for 5-15 minutes. The claimant has no problems paying attention, but he does not finish what he begins. He can follow written and oral instructions without difficulty (Exhibit 4E, p. 9). The claimant interacts well with authority figures. He does not handle stress well, but he can handle changes in a work routine. The claimant has displayed fears of not obtaining a current driver's license (Exhibit 4E, p. 10). Finally, Mrs. Wheeler reported since she has had a heart attack, she has relied on her son more and more to assist her with the cooking, cleaning, and shopping (Exhibit 4E, p. 11).

The undersigned has considered Mrs. Wheeler's statement as described above, but finds her statement is only credible to the extent that the claimant can do the work described herein. Her statement was not made under oath and is no more than a parroting of the subjective complaints reported by the claimant in his Function Report, completed on the same day as Mrs. Wheeler completed her statement (See, Exhibit 3E). The claimant lives in Mrs. Wheeler's home and only has a small monthly income from the VA. Therefore, it is reasonable to assume Mrs. Wheeler supports her son and has a financial interest in seeing him receive benefits, such that her opinion

**17**

Michael David Bagshaw ▇▇▇▇▇▇▇▇▇▇

is not an unbiased one. Most importantly, her statements are not supported by the clinical or diagnostic medical evidence that is discussed more thoroughly herein.

As for the other opinion evidence, the State Agency review physicians determined that the claimant could perform light exertion with preclusions from the following: more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling; more than frequent handling with the left upper extremity; and they recommended the claimant avoid concentrated exposure to hazardous conditions such as working at heights or with dangerous machinery (Exhibits 8F, 9F, 11F). The State Agency review psychiatrists determined that the claimant's mental impairment involving an adjustment disorder caused mild limitations in activities of daily living; moderate limitations in social functioning and in concentration, persistence, or pace; and no repeated episodes of decompensation. They concluded that the claimant could perform simple, repetitive tasks in a non-public work environment (Exhibits 6, 11F). The undersigned concurs and adopts those assessments, which are consistent with the overall evidence of record. The functional capacity adopted herein takes full account of the mild objective findings, incorporates the restrictions supported by objective evidence, and accords the claimant every reasonable benefit of the doubt.

5.   **The claimant is unable to perform any past relevant work (20 CFR 416.965).**

The claimant has past relevant work as a truck driver, lumber yard sales person, self-employed handy man, and landscaper. The vocational expert testified that the claimant's past relevant work as a truck driver is generally performed as semi-skilled work at the medium exertional level, but the claimant performed it as very heavy exertion. The job of sales person in a lumbar yard is generally performed as semi-skilled work at the heavy exertional level, but the claimant performed it as very heavy exertion. The self-employed handyman is skilled work, performed at the medium exertional level, and the landscaper job is skilled work and performed as heavy exertion. Based on the residual functional capacity found herein, the vocational expert testified that the claimant cannot perform his past relevant work.. Accordingly, the claimant is unable to perform past relevant work.

6.   **The claimant was born on April 4, 1959 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

7.   **The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).**

8.   **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

9.   **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

**18**

See Next Page

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as mail clerk, with 3,500 jobs in the California economy and 47,000 jobs in the national economy; bench assembler, with more than 45,000 jobs in the California economy and over 400,000 in the national economy; and electronics worker, with 2,500 jobs in the regional economy and more than 10,000 jobs in the national economy.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**10. The claimant has not been under a disability, as defined in the Social Security Act, since May 10, 2006, the date the application was filed (20 CFR 416.920(g)).**

**19**

Michael David Bagshaw ▇▇▇▇▇▇▇                    Page 13 of 13

## **DECISION**

Based on the application for supplemental security income filed on May 10, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Joseph D Schloss*
Joseph D. Schloss
Administrative Law Judge

December 2, 2008
Date

KF

**20**